**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA and the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, VIRGINIA, WASHINGTON, AND THE DISTRICT OF COLUMBIA, *ex rel.* SCOTT LANEY, | Case No: 6:15-CV-1367-ORL-?-DAB **COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT [31 U.S.C. § 3729 *et seq.*] JURY TRIAL DEMANDED FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| Plaintiffs, | |
| v. | |
| MILLENNIUM HEALTH, LLC., | |
| Defendant. | |

## COMPLAINT

*Qui tam* plaintiff Plaintiff-Relator Scott Laney ("Relator"), through his attorneys the

Newsome Melton Law Firm and Phillips & Cohen LLP, on behalf of the United States of

America, and the Plaintiff-States of California, Colorado, Connecticut, Delaware, Florida,

Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan,

Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina,

Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, Washington, and the District

-2-



of Columbia (the "Plaintiff-States") for this Complaint against Millennium Health., LLC (the "Defendant" or "Millennium"), alleges as follows:

## I.   <u>INTRODUCTION</u>

1.      This is an action to recover damages and civil penalties on behalf of the United States Government (the "United States" or the "Government") and the Plaintiff-States, arising from false and/or fraudulent statements, records, and claims made and/or caused to be made by the Defendant Millennium Health, LLC and/or their agents and employees in violation of the federal False Claims Act, 31 U.S.C. § 3729, *et seq*. and similar state statutes.

2.      Relator brings this *qui tam* case to redress the knowing submission of false or fraudulent claims by Defendant Millennium Health, LLC in connection with Millennium's billing the federal and state governments for pharmacogenetic ("PGT") tests. The pharmacogenetics field studies how an individual's genetic makeup impacts that individual's response to pharmaceutical drugs. PGT tests are intended to analyze genetic variations associated with reactions to certain medications. These genetic variations identified by PGT testing may affect how drugs are received, transported, and metabolized throughout that particular patient's body, which may impact which drug a doctor chooses to prescribe or how safe or effective a drug is for that individual patient. PGT test samples are collected by swabbing the inside of a patient's cheek for a saliva sample.

3.      Defendant Millennium is a San Diego based company providing nationwide laboratory testing services. As part of its services, Millennium offers several types of laboratory testing including urine and oral fluid testing for medication monitoring, and PGT testing for informing and influencing clinicians' drug and dosing decisions. Millennium advertises that its PGT tests will allow medical practitioners to make more informed treatment decisions tailored to a patient's specific genetic profile. Although some of the

{00065725; 1 }

patients receiving Millennium's PGT tests are insured by private health insurers or pay cash, a large percentage of patients are insured by Medicare and Medicaid, as well as other government funded health programs. Millennium directly bills health insurers, including Medicare, for the cost of PGT testing.

4.     Millennium's complete PGT test suite tests fourteen genes for different variations that may affect how a patient reacts to a certain drug. The genes that Millennium's complete PGT test suite covers are divided into four general categories according to the health issue they implicate: pain, cardiovascular health, addiction, and mental health.

5.     Each gene is associated with a corresponding drug that genetic variations to that gene may affect. For example, the gene CYP2C9 is associated with the anticoagulation drug Warfarin. Warfarin thins the blood and is used for preventing blood clots, particularly in patients with artificial heart valves. Warfarin is metabolized through the liver. Enzymes that aid in the metabolism of Warfarin in the liver are encoded by variants of the gene CYP2C9. Depending on the variant of the gene a patient has, their metabolism of Warfarin may be lower, which in turn increases the concentration of the drug in the patient's system. In theory, knowing which gene variant of CYP2C9 that a particular patient who is a candidate for Warfarin has will aid a doctor in determining which dosage of Warfarin to prescribe for the patient.

6.     Although certain genes may correspond with the metabolism of certain pharmaceutical drugs, the clinical value of PGT testing to date has been limited. Most uses of PGT testing are considered investigational due to the difficulties of utilizing and interpreting PGT test results. These difficulties lead to uncertain clinical outcomes. These poor clinical outcomes are reflected in Medicare's policy toward PGT testing, which considers most PGT tests investigational and medically unnecessary. Medically unnecessary tests, including those tests used to merely screen for disease without particular signs and

symptoms present in the patient, are not covered by Medicare.  For example, while variations in the CYP2C9 gene may impact metabolism of Warfarin, Medicare issued a National Coverage determination in 2009, finding that CYP2C9 PGT testing is not medically necessary or reasonable in all cases, unless as part of a controlled clinical study.  Because PGT testing has no demonstrated clinical utility for determining a proper dosage of Warfarin, Medicare does not cover this test.

7.      Despite the fact that Medicare considers most uses of PGT testing investigational and medically unnecessary, Millennium Health targets Medicare patients for its PGT tests, and submits the resulting claims for payment for those PGT tests to Medicare for reimbursement.  Millennium also submits claims for payment for PGT testing to other government healthcare programs.

8.      In addition to submitting claims for payment for tests that are not medically necessary because they are investigational, Millennium also submits claims for payment for tests that are not medically necessary because the test was not ordered by a doctor based on the diagnostic needs of a particular patient.  Instead of submitting claims for payment for only those tests deemed relevant to a particular patient based on his or her medical history and pharmaceutical needs, Millennium's business strategy requires it to test as many patients as possible, bypassing doctors in the process.  Millennium trained and encouraged its sales representatives to collect as many samples for PGT testing as possible by offering to test all patients in a clinic or long term healthcare facility.  While Millennium claims that its services provide personalized medicine by allowing physicians to customize drug regimens to individuals' specific genotypes, it is in fact doing the opposite—indiscriminately testing as many individuals as possible regardless of whether their symptoms or medical history indicated that testing was necessary.

9.     Millennium carried out this strategy by directing its sales representatives to stage collection days or "inservice" days, where representatives would go to a doctor's office, nursing home, or other provider location and collect samples from as many patients as possible, regardless of the patient's medical need for testing.  In many instances, sales representatives would collect the swab sampling and prepare the test requisition orders themselves, choosing which tests to order for patients in violation of Medicare's requirement that testing be requisitioned by the patient's treating physician or Medicare authorized nonphysician practitioner, such as a clinical assistant.  As part of the incentive system for sales representatives, Millennium paid sales representatives a commission of $9 for each PGT specimen collected.

10.     Millennium sales representatives also failed to obtain the authorization required for Medicare reimbursement.  Millennium sales representatives were instructed to obtain an initial authorization from a physician, and thereafter to submit a test requisition form for individual testing using that physician's NPI number.  Sales representatives were instructed that as long as the requisition form was signed by the patient, that was sufficient.  As a consequence, Millennium sales representatives, instead of doctors or other qualified clinical personnel, often determined which particular PGT tests or panel to order.

11.     On "inservice" days, sales representatives performed the physical collection of test samples, filled out the requisition forms, and packaged testing samples for shipment to the laboratory.  Sales representatives typically brought the staff coffee, snacks and lunch as part of the strategy to influence the staff to let them collect samples from the patients.  By performing all of the work needed to collect and process the testing samples, as well as providing other benefits, Millennium provided remuneration for the purpose of influencing the use or recommendation of goods or services paid for by federal health care programs in violation of the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b).

{00065725; 1 }

12.     Through these practices, which are ongoing, Millennium submitted and continues to submit false or fraudulent claims for reimbursement of its PGT testing services in violation of the federal False Claims Act and the similar statutes of the Plaintiff-States. Millennium was also under an ongoing obligation to return to the federal Government overpayments from these illegally obtained funds.  Upon information and belief, Millennium was engaged in these practices at the same time it was negotiating and ultimately subject to a Corporate Integrity Agreement with the Government that committed Millennium to cease such practices, resulting in additional violations of the False Claims Act.

13.     The federal False Claims Act (the "FCA") was originally enacted during the Civil War.  After finding that fraud in federal programs was pervasive and that the FCA, which Congress characterized as the primary tool for combating government fraud, was in need of modernization, Congress substantially amended the FCA in 1986 to enhance the ability of the United States Government to recover losses sustained as a result of fraud against it.  Congress intended that the 1986 amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.  Congress further substantially amended the FCA in 2009 and 2010 to, among other things, strengthen whistleblowers' ability to bring and maintain actions on the Government's behalf.

14.     The FCA prohibits, *inter alia*: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; and (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim.  31 U.S.C. §§ 3729(a)(1)(A)-(B).  Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation,

{00065725; 1 }

plus three times the amount of the damages sustained by the United States.  31 U.S.C. §3729(a)(1).

15.     For purposes of the FCA, a person "knows" a claim is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1).  The FCA does not require proof that the Defendant specifically intended to commit fraud.  *Id.*  Unless otherwise indicated, whenever the word "know" and similar words indicating knowledge are used in this Complaint, they mean knowledge as defined in the FCA.

16.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery.  Such a person is known as a qui tam "relator."  The FCA requires that the qui tam relator's complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

17.     The federal Anti-Kickback Statute prohibits paying remuneration to a healthcare provider to influence the purchase of goods or services paid for by federal healthcare.  A violation of the federal AKS also violates the False Claims Act if federal reimbursement for any procedure that was obtained by the payment of a kickback is sought.  42 U.S.C. § 1320a-7b(g).

18.     *Qui tam* Plaintiff-Relator Scott Laney seeks through this action to recover all available damages, civil penalties, and other relief for the FCA and state law violations alleged in this Complaint.

## II.   PARTIES

### A.   The Relator

Plaintiff-Relator Scott Laney ("Plaintiff" or "Relator") is an individual residing and domiciled in the State of Idaho.  In June 2013, Relator began working for Millennium as a sales representative covering the southern portion of Idaho.  As of the date of filing, Relator continues to work as a sales representative for Millennium in Idaho.

19.     In his capacity as a sales representative, Relator personally witnessed Millennium's PGT testing practices.

### B.   The Defendant

Defendant Millennium Health LLC ("Millennium") is a California corporation headquartered at 16981 Via Tazon, San Diego California 92127.  Millennium is a wholly-owned subsidiary of Millennium Lab Holdings II LLC, a Delaware limited liability company.  Millennium describes itself as "a leading health solutions company that delivers timely, accurate, clinically actionable information to inform the right treatment decisions for each patient at the right time."  Millennium offers a variety of laboratory testing services, including urine testing for drug monitoring purposes, pharmacogenetic testing, as well as predictive analytics programs for pharmaceutical usage.

20.     Millennium's sales representatives transact business in all fifty states, including in the Plaintiff-States of California, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, Washington, and the District of Columbia. Millennium derives a significant portion of its revenue for PGT testing from Medicare and Medicaid reimbursement.  Millennium's NPI number is 1497933162.

{00065725; 1 }

## III.   JURISDICTION AND VENUE

21.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

22.    This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732, which authorizes nationwide service of process.  Moreover, Defendant can be found, resides in, or has transacted the business that is the subject matter of this lawsuit in this District.

23.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendant can be found, resides in, or has transacted the business that is the subject matter of this lawsuit in this District.

24.    Although it is no longer jurisdictional, the public disclosure bar of the federal False Claims Act does not bar this suit.  The Plaintiff-Relator's complaint is not based upon allegations or transactions of fraud that have been publically disclosed within the meaning of the False Claims Act.  Even if the allegations or transactions of fraud had been publicly disclosed, the Plaintiff-Relator is an original source of the information within the meaning of the FCA.   His information is based upon his personal observations, independent of any relevant public disclosure and materially adds to any information that could have been publicly disclosed.  To the extent the applicable statutes of the Plaintiff-States contain public disclosure provisions, those provisions also do not bar this suit.

## IV.   APPLICABLE LAW

### A.    The Medicare Program

25.    Congress established the Medicare program, or Title XVIII of the Social Security Act, in 1965 with the goal of providing nationalized health coverage for Americans aged 65 or older.  In addition to the elderly, a large portion of Medicare's patient population

{00065725; 1 }

-10-

is disabled.  In 2015, Medicare covered roughly 55 million Americans, either through the traditionally federally administered Medicare program or through a private health plan, also known as a Medicare Advantage plan.  Medicare is funded through the Medicare Trust Fund, which relies on workers' payroll deductions and government funds.

26.     The United States Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), an agency within HHS, direct and manage the Medicare program.

27.     Medicare has four parts: Part A, providing hospital insurance; Part B, providing medical insurance, Part C, which includes managed care plans; and Part D, which provides prescription drug benefits.  Medicare Part B includes reimbursement for covered out-patient laboratory tests performed by third parties when the tests are medically necessary.

28.     In order to administer Part B and provide payment to medical service providers in various geographical areas, the federal government contracts with private companies.  These entities are known as Medicare Administrative Contractors or "MACs."  MACs are tasked with processing Medicare claims, determining coverage for patients, and reimbursing physicians from the Medicare Trust fund.  Out-patient laboratory testing claims are handled as part of this process.  The designated MAC for Millennium is Noridian Healthcare Solutions, LLC.  Noridian is the MAC for consolidated Medicare jurisdiction E, which includes California, where Millennium's laboratory is located.

29.     Section 1862 of the Social Security Act, codified at 41 U.S.C. §1395y(a)(1)(A), explains that under Medicare Part B, "no payment may be made under part A or part B for any expenses incurred for items or services . . . [that] are not reasonable and necessary for the prevention of illness."  Generally, Medicare does not reimburse for laboratory tests used for screening purposes when the patient does not display symptoms or particular susceptibility to the screened-for disease.  Medicare reimburses providers only for

the cost of services that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y.

30.     Decisions about what services, procedures, or tests rendered by third party payer are reimbursed, or "covered," by Medicare, is made either locally, or at the national level. A national coverage determination is binding on all MACs and Medicare carriers. In the absence of a national coverage determination being made, local determinations fill the gap. The vast majority of coverage determinations happen at the local level, particularly for new medical technologies such as PGT testing. Local level decisions are typically made by fiscal intermediaries, MACs, or durable medical equipment regional carriers. Local or regional determinations are binding only upon those providers that contract with Medicare through the MAC that issued the determination. Because of this lack of standardization, local determinations may sometimes conflict with one another if two or more MACs have made different decisions about whether a particular service is reasonable and necessary and therefore covered by Medicare.

31.     Medical services or items that have not been established as safe and effective and have no proven clinical utility are not reasonable and necessary for diagnosis or treatment. Medical necessity is shown only when a service has been proven to be safe and effective. Health services, including laboratory tests, that do not meet this standard are considered investigational. With some limited exceptions for research studies, the use of investigational tests or drugs is not covered by Medicare.

32.     In addition to the requirement that a test be safe and effective for the diagnosis and treatment of a patient, the person requisitioning the lab testing services must be one of the provider types covered by Medicare. Physicians are a covered provider type, as are nurse practitioners, clinical nurse specialists, and physician's assistants, when operating within the

{00065725; 1 }

-12-

scope of their authority and under an appropriate level of supervision by a physician. 42

C.F.R. § 410.32. In order for a laboratory test to be medically necessary, covered medical

personnel must be the ones ordering the test and collecting the testing sample.

33.     Tests that are "not ordered by the physician who is treating the beneficiary are

not reasonable and necessary." To receive Medicare reimbursement, "diagnostic laboratory

tests, and other diagnostic tests must be ordered by the physician who is treating the

beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a

specific medical problem and who uses the results in the management of the beneficiary's

specific medical problem." 42 C.F.R. § 410.32(a). The physician must also utilize the

results of the lab test to manage the patient's particular medical condition. *Id.* Medicare

does not cover lab testing for general screening that is not directed toward a patient's

personal symptoms or medical history.

34.     To comply with the requirements of 42 C.F.R. § 410.32(a) that a treating

physician order and then use the lab results, laboratories must keep documentation to

demonstrate that these requirements have been met. 42 C.F.R. § 410.32(d)(2)(ii). The OIG's

Compliance Program Guidance for Clinical Laboratories advises that "[u]pon request, a

laboratory should be able to produce or obtain from the treating physician (test ordering),

authorized person on the physician's staff or other individual authorized by law to order tests

the documentation to support the medical necessity of the service the laboratory has provided

and billed to a Federal or private health care program." 63 Fed. Reg. 45076, 45079 (Aug. 24,

1998). Furthermore, the OIG Compliance Guidance counsels that "laboratories should

encourage physicians or other authorized individuals to submit diagnosis information for all

tests ordered, as documentation of the medical necessity of the service. The form should

contain a statement indicating that Medicare generally does not cover routine screening

tests. " *Id.* In addition, where billing is concerned, the OIG Compliance Guidance state that

{00065725; 1 }

-13-

laboratories cannot alter the physician's test order in any way, such as decreasing or increasing the number of services performed, without the express consent of the ordering doctor or medical professional. *Id.* at 45080.

35.     As a condition of Medicare payment, a physician or other Medicare-qualified clinical personnel must certify that the testing performed is medically necessary and reasonable for the diagnosis and treatment of the patient.   42 U.S.C. § 1395n(a)(2)(B); 42 C.F.R. § 424.10(a).  In some instances, recertification of the necessity of the services is also required by the physician. 42 C.F.R. § 424.10(a).  The physician, nurse practitioner, clinical nurse specialist, or physician signing the certification must have knowledge of the case.  42 C.F.R. § 424.24(g)(2).

**B.     Billing Medicare for Testing Services**

36.     Medicare typically pays for laboratory testing claims on a fee-for-service basis.  Payment for outpatient lab tests is generally based on the Clinical Laboratory Fee Schedule set by section 1833(h) of the Social Security Act.  42 U.S.C. § 1385l(h)(1)(A).  Laboratories are reimbursed either the lesser of their actual charges, the local fee for that geographic area, or a national limit which is a percent of the median of all local schedule amounts for each test.  Laboratory fees are adjusted for inflation and updated yearly.  In general, Medicare reimburses lab test providers for about 80 percent of the Medicare-approved amount for the testing. Medicare Claims Processing Manual [Pub. 100-4] Chapter 16, Section 20.

37.     Each type of test correlates to a CPT code.  When a laboratory provider like Millennium performs a test, the provider chooses the CPT code that fits the test and submits this code to the MAC.  The CPT code selected determines how much the MAC will reimburse for that particular type of test.  Laboratory testing providers, such as Millennium,

bill their MAC directly from the location where the test was performed.  Medicare Claims Processing Manual [Pub. 100-4] Chapter 16, Section 10.

38.     The CPT codes typically used for the laboratory tests that Millennium performs are 81225, 81226, 81227, 81291, 81355, 81381, 81401, and 81479 (which, as a generic code for genetic testing, can be used to bill for different gene tests, and may be billed up to six times on one PGT panel).  Millennium's suggested billing price for all 14 PGT tests is $3,423.04.

39.     Medicare requires that the laboratory that submitted the claim keep and maintain documentation that it obtained from the ordering physician, indicating that the treatment was necessary and responsive to the patient's particular diagnosis or medical issue. The laboratory must also keep documentation to show that the claim it submitted to Medicare accurately reflects the information it received from the ordering physician.  42 C.F.R. § 410.32(d)(2)(ii).

40.     CMS will deny a claim where the documentation the laboratory provider keeps does not demonstrate that the service provided is reasonable and necessary, or if the MAC has made a local coverage determination that the service is not covered.  42 C.F.R. § 410.32(d)(3)(ii).

### C.     Pharmacogenetic Testing is Generally Considered Investigational and Not Medically Necessary

41.     One National Coverage Determination ("NCD") and multiple local coverage determinations ("LCDs") have been rendered by MACs regarding pharmacological tests for the fourteen genes that Millennium's PGT testing suite covers.  With very limited exceptions, Medicare carriers have found the types of PGT tests that Millennium performs to be investigational.  None of the LCDs that address the genetic tests offered by Millennium conflict with each other.  Tests are either not mentioned, or all the LCD's characterize them as investigational, with minor exceptions.

{00065725; 1 }

42.     By way of example, Millennium tests the CYP2C19 gene for variations that influence how fast a patient might metabolize pharmaceutical drugs.  For its pain management PGT offerings, Millennium performs this test for the purpose of judging how a patient might metabolize the drug Carisoprodol, a muscle relaxant.  The CPT code Millennium uses associated with this test is 81225, and Millennium's suggested billing price is $364.75.

43.     Millennium's MAC, Noridian Healthcare Solutions, LLC, issued LCDs concluding that there is "insufficient evidence to demonstrate that genetic testing for the CYP2C19 gene improves clinical outcomes" for all uses except an exemption for patients using Plavix therapy.

44.     Other MACs have issued LCDs with similar conclusions, including First Coast Service Options, which has rendered LCDs in its jurisdiction encompassing Florida, Puerto Rico, and the Virgin Islands, CGS Administrators, LLC rendered an LCD for Kentucky and Ohio on PGT testing for the CYP2C19 gene, and Palmetto GBA rendered an LCD for Virginia, North Carolina, South Carolina, and West Virginia.  Cahaba Government Benefit Administrators also rendered LCDs on PGT testing of the CYP2C19 gene for its Medicare jurisdiction covering Alabama, Georgia, and Tennessee.  All of these MACs found "insufficient evidence to demonstrate that genetic testing for the CYP2C19 gene improves clinical outcomes" for all uses except an exemption for patients using Plavix therapy.  None of the LCDs addressing PGT testing of CYP2C19 variations for metabolizing pharmaceutical drugs found that testing for general metabolism rates of unspecified drugs, including Carisoprodol, was medically reasonable and necessary.

45.     As further detailed herein, local coverage determinations provide that most of the PGT tests that Millennium offers are similarly considered investigational.  Even where

the tests are not investigational for all purposes, the uses that are considered medically reasonable and necessary cover only very limited categories of patients.

### D.   The Medicaid Program

46.     Medicaid is a public-assistance program created in 1965 that provides payment of medical expenses for low-income and disabled patients.  Funding for Medicaid is shared between the federal government and those states participating in the program. Medicaid is the largest source of funding for medical services for America's poor and disabled.  Each provider that participates in the Medicaid program must sign a provider agreement with his or her state.

47.     Federal regulations require each state to designate a single state agency responsible for the Medicaid program.  The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX of the Social Security Act and with the regulations the Secretary of HHS promulgates.  Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines.  Federal statutes and regulations restrict the items and services for which the federal government will pay through its funding of state Medicaid programs.

48.     Like Medicare, Medicaid covers laboratory testing only if it is necessary to diagnose or treat a patient's particular medical condition.  Although Medicaid reimbursement for laboratory testing varies depending on the state in which the billing is done, all services provided must meet the medical necessity threshold.  For example, Florida's Medicaid program covers only medically necessary clinical laboratory procedures.

### E.   Other Federal and State-Funded Health Care Programs

49.     The federal Government administers other health care programs that include, but are not limited to, TRICARE, CHAMPVA, and the Federal Employee Health Benefit Program.

{00065725; 1 }

50.     TRICARE, which the United States Department of Defense administers, is a health care program for individuals and dependents affiliated with the armed forces. 10 U.S.C. § 1071, *et seq.*; 32 C.F.R. § 199.4(a).

51.     CHAMPVA, which the United States Department of Veteran Affairs Administers, is a health care program for families of veterans with 100-percent service-connected disabilities. 38 U.S.C. § 1781, *et. seq.*; 38 C.F.R. § 17.270(a).

52.     The Federal Employee Health Benefit Program, which the United States Office of Personnel Management administers, provides health insurance for federal employees, retirees, and their survivors. 5 U.S.C. § 8901, *et seq.*; 5 C.F.R. § 890.12.

53.     The States have programs providing health care benefits to certain individuals based on those individuals' financial need, employment status, and other factors. This complaint refers to those programs as "state-funded health care programs."

**F.     The Anti-Kickback Statute**

54.     The federal health care Anti-Kickback Statute, 42 U.S.C. § 1320a-7b ("AKS"), arose out of Congressional concern that financial inducements can influence health care decisions and result in goods and services being more expensive, medically unnecessary, and harmful to patients. To protect the integrity of federal health care programs, Congress prohibited the payment of kickbacks in any form, regardless of whether the kickback actually gives rise to overutilization or unnecessary care. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare and Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

55.     The AKS prohibits any person or entity from making or accepting payments to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a federally-funded health care program. 42

U.S.C. § 1320a-7b(b).  The statute prohibits laboratories from offering or paying any remuneration, in cash or kind, directly or indirectly, to induce or influence physicians or others to order or recommend laboratory services that may be paid for by federal health care programs. The AKS has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68 (3d Cir.), *cert. denied*, 474 U.S. 998 (1985).

56.     Compliance with the AKS is a precondition to both participation as a health care provider in and payment under Medicaid, Medicare, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefit Program, and other federal health care programs.

57.     For example, to establish eligibility and seek reimbursement from the Medicare Program, hospitals and other providers enter into Provider Agreements with CMS. As part of that agreement, the provider must sign the following certificate:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me].  The Medicare laws, regulations and program instructions are available through the [Medicare] contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

58.     Similarly, compliance with the federal AKS is a prerequisite to a provider's right to receive or retain reimbursement payments from government-funded health care programs.

59.     In sum, physicians, hospitals, and other providers who participate in federal health care programs must certify (often explicitly, in a provider agreement or on claim

forms) that they have complied with the applicable federal rules and regulations, including the AKS.

60.     Any party convicted under the AKS must be excluded from federal health care programs (*i.e.,* not allowed to bill for services rendered) for a term of at least five years. 42 U.S.C. § 1320a-7(a)(1). Even without a conviction, if the Secretary of the Department of Health and Human Services ("HHS") finds administratively that a provider has violated the statute, the Secretary may exclude that provider from the federal health care programs for a discretionary period (in which event the Secretary must direct the relevant State agency to exclude that provider from the State health program), and may consider imposing administrative sanctions of $50,000 per kickback violation. 42 U.S.C. § 1320a-7(b).

61.     Pursuant to the Affordable Care Act passed in 2010, any claim submitted to a federal health care program that includes items or services resulting from violations of the AKS constitutes a false or fraudulent claim for purposes of the False Claims Act. 42 U.S.C. § 1320a-7b(g).

62.     The States also have enacted statutes prohibiting kickbacks in connection with State Medicaid services. Pursuant to State statutes, regulations, and other administrative materials, the States have made compliance with both federal and State anti-kickback statutes and rules a prerequisite to receiving or retaining reimbursement payments from state-funded health care programs. *See* Fla. Stat. §§ 409.907, 409.920(2)(e); Cal. Welf. & Inst. Code §§ 14107.2(a), (b), 14107.11-(a)(2); 305 Ill. Comp. Stat. 5/8A-3(b)(2), (c)(2); D.C. Code § 4-802; Nev. Rev. Stat. § 422.560(1)(a); Ind. Code § 12-15-24-2; Mont. Admin. R. §§ 37.85.406(10), 37.85.501(h), (k); Mont. Code Ann. § 45-6-313(1)(b)(i); Minn. R. §§ 9505.2165-4(C), 9505.2215-1A; N.J. Stat. Ann. § 30:4d-17(c); N.J. Admin. Code§ 1 0:49-5.5(a)(l7); N.M. Code R. §§ 8.302.1.11, 8.351.2.9-13; N.Y. Soc. Serv. Law§ 366-D(2); N.C. Gen. Stat. §§ 108A-63(g), (h), 108A-70.16, N.C. Admin. Code 22F.0301(5); Tenn. Code

{00065725; 1 }

Ann. § 71-5-118; Tenn. Comp. R. & Regs. §§ 1200-13-1-.05(1)(a)(6), 1200-13-1-.21(2), (3);

N.Y. Comp. Codes R. & Regs., tit. 18, §§ 515.2(b)(5), 518.1-2; La. Rev. Stat. Ann. §

46:438.2(2)(A)(2); Va. Code Ann. §§ 32.1-315; Tex. Hum. Res. Code Ann.§§ 32.039(b),

32.039(c)(l); Okla. Stat., tit. 56, § 1005(A)(6); Tex. Penal Code Ann.§ 35A.02(a)(5); Wash.

Rev. Code § 74.09.240; Wash. Admin. Code § 182-502-0016(1); *see also* Florida Medicaid

Provider Handbook; Illinois Medicaid Handbook; Minnesota Medicaid Provider Manual;

Nevada Medicaid Services Manual; Georgia Medicaid Manual; Louisiana Medicaid Provider

Manual; Oklahoma Medicaid Provider Billing and Procedure Manual; Virginia Medicaid

Provider Manual.

63.     Many states, including the Plaintiff-States, also require Medicaid providers,

including laboratories, to enter into provider agreements requiring them to comply with all

applicable federal and State Medicaid Laws (sometimes with specific emphasis on the AKS)

and/or conditioning the right to payment on compliance with those laws.

## V.     ALLEGATIONS

### A.     Millennium Knowingly Submits Claims for Payment that are False or Fraudulent Because the Tests are Not Ordered by a Qualified Medical Professional as Medically Reasonable and Necessary for an Individual Patient

64.     Millennium engages in the systematic practice of submitting claims for

payment for laboratory tests that are not authorized by qualified medical personnel for the

treatment of individual patients.  Millennium trains its sales force to bypass the qualified

medical personnel at clinics and long term care facilities and tests patients regardless of

medical need for the tests.  Millennium submits claims for payments for those tests to the

Government for payment, receives payment for tests that are not eligible for coverage, and

does not return the overpayments.

65.     In order to collect the test swabs needed for PGT testing, Millennium's sales

representatives first obtain an initial signature from the doctor(s) at the facility where

{00065725; 1 }

-21-

Millennium is collecting samples.  These facilities could be a doctor's office, nursing home, substance abuse clinic, or pain management clinic.  Via Millennium's "New Client Registration" form, sales representatives obtain the practice's contact information, including the names of the providers and their NPI (National Provider Identifier Standard) numbers. The providers also check a box to indicate if they are a physician, nurse practitioner, physician's assistant, or an osteopath.

66.     One of the providers from the facility signs Millennium's New Client Registration form.  This form includes a certification that the health care provider will "only order the required individual tests that are medically necessary for the diagnosis and treatment of my patients," that only "the authorized practitioners in my practice are responsible for selecting the individual test to be performed on each patient," and that they have not been "offered or provided anything of value in exchange for referral of testing to MH."  Exhibit 1 (copy of Millennium Health's New Client Registration form).   The form's language is mere window dressing and does not reflect what actually occurs, as further detailed below.

67.     After the New Client Registration form is signed, sales representatives treat this form as a blanket authorization to test patients without obtaining authorization from providers with respect to testing of individual patients.  Sales representatives would set up an "inservice" or "training" day, as Millennium euphemistically referred to them, where they would coordinate with providers' office staff to come into the office and obtain specimens and test orders from as many patients as possible. *See* Exhibit 2 (October 23, 2014 email from Tony Calobrisi, Millennium National Sales Director, Genetics, to sales representatives). Despite being termed "training days," Calobrisi and Josh Calcanis, Genetics Sales Specialist, requested sales representatives to provide the expected numbers of samples to be collected from these training days.

{00065725; 1 }

68.     Sales representatives use these "inservice" or "training" days as an opportunity to obtain a test order from every patient who comes into the facility with an appointment that day, or in a nursing home, or other long term care facility, as many of the home's residents as possible.  Despite Millennium labeling these as "inservice" or "training" days, sales representative would return to the same location, which would be unnecessary if the purpose of the day were actually to train the physician staff.    Sales staff also extolled the quantities of samples that could be collected on an "inservice" day.  *See, e.g.,* Exhibit 3 (Customer Support Specialist Savanna Scotson text message).   Likewise, then-Western Regional Director Nicole Moberg instructed sales representatives in a September 27, 2013 email to remind providers that after doing one "inservice" or "training" day, sales representatives should tell office staff at the facility where they are collecting specimens that "if this goes well, we can be back tomorrow to do the same." *See* Exhibit 4 (September 27, 2013 email from Nicole Moberg, Western Regional Director to sales representatives).

69.     Sales representatives are paid in a manner intended to incentivize these practices.  Specifically, in addition to their base salary, sales representatives are paid $9 per specimen collected.  Sometimes, teams of sales representatives—who typically worked in teams of two—would collect in excess of 1,000 test specimens per month.  If a sales team collected 1,000 samples, each sales representatives on the team could bring in approximately $9,000 extra per month on top of his or her compensation.  Customer support specialists were paid an extra $6 per specimen, which at 1,000 specimens could bring in an extra $6,000 a month.

70.     It was common knowledge at Millennium that instead of a doctor or other medical provider seeing each patient and filling out an individual test requisition form to order only those tests responsive to the specific patient's medical conditions, Millennium sales representatives could, and did, fill out the requisition forms themselves.  Because sales

{00065725; 1 }

-23-

representatives were under a great deal of pressure to collect specimens and drive their numbers higher, filling out requisition forms themselves removed the time and effort of having to get qualified medical professionals to fill out each form. By doing this, sales representatives also encountered less resistance from doctors who did not want to take the time to do the work themselves.

71.     Millennium instructs its sales representatives that a medical provider's signature is not required on an individual test requisition form if the patient signs the form— even though the form provides a space for the provider's signature and such authorization is required. The provider's signature on this form also provides an attestation that the provider has requisitioned the test "to assist in managing the treatment for a current condition, disease, illness, impairment, symptom or disorder" and that the test "is reasonable and medically necessary for this patient." Exhibit 5 (copy of Millennium's PGT test requisition form).

72.     Millennium does not have the records to support individual determinations of medical necessity as required by Medicare. 42 C.F.R. § 410.32(d)(2).

73.     On the "inservice" or "training" day, sales representatives would collect the cheek swab samples from patients themselves. This allowed the representatives to conduct more tests because they were not tied to a doctor's hours or availability. For example, Millennium Genetics Sales Specialist Josh Calcanis praised this tactic in an email to Jake Knee, a regional manager, Jade Melter, a regional director, and Nicole Molberg, the current Western U.S. Vice President of Sales, formerly the Western regional director. He noted that having "complete control of when you collect" allowed Dan DeGrace, an Ohio Customer Support Specialist, to "knock out 40 specimens in a 3 hour window," and by collecting outside of typical work hours he was able "to hit crazy numbers." Exhibit 6 (April 7, 2015 email from Genetic Sales Specialist Josh Calcanis to Pacific Northwest sales representatives).

74.     Sales representatives were commonly put in unused side offices where staff would send patients for testing, where Millennium sales representatives personally collected the test specimens.  In some situations such as when Millennium did specimen collection at nursing homes or substance abuse clinics, the medical directors of those facilities were not present on the days when Millennium representatives would come to the facility to collect samples.  Although the medical directors were not present, Millennium would bill for testing under these provider's NPI numbers.  As with the clinics, Millennium sales representatives were trained to treat the medical director's signature on the New Client Registration form as sufficient to allow them to collect samples without individual test orders signed by medical providers, or supervision by medical staff.

75.     By disregarding Medicare's requirement that all lab testing be ordered by the patient's treating physician or other medical provider, Millennium representatives were able to obtain test orders for a far greater number of patients than if only those tests that corresponded with an individual patient's medical history and needs had been ordered.

76.     Millennium sales management referred to the practice of testing all patients at a given location as "baseline."  Testing the baseline was encouraged by sales management as a tactic that representatives should use in order to drive up sales.  For example, in July 2013 Millennium's Western Vice President of Sales, Nicole Moberg, emailed sales representatives encouraging them to use this tactic, with an example of a representative obtaining a commitment to test by only suggesting baseline testing to the doctor.  Exhibit 7 (July 17, 2013 email from Nicole Moberg, then-Western Regional Director to sales representatives).  In addition to testing an entire facility as the "baseline," Millennium representatives were instructed to return to facilities a day later—termed "residual" follow up—and further in the future to obtain a "follow up baseline" after the facility had experienced patient turnover.

*See* Exhibit 6; *see also* Exhibit 8 (Nicole Moberg's February 19, 2014 email from Nicole Moberg to sales representatives).

77.     Millennium instructed its sales representatives to use PGT tests as screening tests, despite Medicare's requirement that tests be used only for diagnostic purposes to address specific symptoms.  Instead, Millennium representatives advertised and used PGT testing for screening purposes.  By presenting PGT tests as testing that screened for risk, this allowed Millennium to test patients en masse instead of only those with specific needs.

78.     A May 10, 2013 email from Millennium Regional Manager Chad Reeves describes and espouses Millennium's policy of using PGT tests as screening tests.  Reeves counseled representatives to lead sales pitches with the idea that "PGT can help identify which patients are 'higher risk patients' before the first prescription is cut."  He encouraged representatives to ask doctors, "What if I could establish for you which patient is at a higher risk for drug-to-drug interaction or toxicity overdose" and follow with "Great, give me three minutes with each patient and you'll have your answer in 7 to 10 days."  By approaching doctors with the proposition that PGT testing determines a patient's risk, Millennium pushed the idea that testing all patients was the logical thing to do, since everyone will have genetic variations that impact how they metabolize drugs in some way.  This approach disregards Medicare's requirement that tests be ordered for the management of the patient's specific medical problem.   Reeves' email brushes aside using the test for specific patients' problems, identifying the practice of "leading with patient care" as one of the "three pitfalls of a PGT pitch."  "We know that the 3 types of patients who are going to most benefit from PGT are those with side effects, no effects, or high doses," Reeves explained, "but the practice benefits from testing everyone when they're assessing risk.  IF YOU ASK FOR 3 PATIENTS, YOU'RE GOING TO GET 3 PATIENTS.  Ask to test everyone, let them decide out who doesn't need to be tested." (emphasis added).   Exhibit 9 (June 24, 2013

email forwarded from Regional Sales Manager Chad Reeves to Bailey Robertson and Scott Laney).

79.     As part of this approach to testing as many patients as possible regardless of whether it was medically necessary, Millennium's sales management would encourage sales representatives to compete to see which teams could collect the highest number of test samples.  Sales management sent frequent emails to its representatives detailing how many samples had been collected in a given month, and which teams were the "winners" with the most samples collected.  Millennium set increasingly higher PGT testing collection goals for its sales representatives.

80.     For example, in December 2014, Millennium's National Director of Genetic Sales Tony Calobrisi informed sales representatives that they had "gobbled" another record for the number of samples collected the previous month, moving the daily average number of PGT tests collected from 717 to 757, with the highest collection number for the month being 1092. The new goal to reach was set at 800.  The top five teams of sales representatives were then ranked by their collection numbers from March.   Calobrisi signed off with the exhortation "Get Spit Done."   Exhibit 10 (National Sales Director Tony Calobrisi's December 2, 2014 email to sales representatives discussing sales records and goals).   Sales representatives were regularly ranked on the numbers of specimens collected. *See* Exhibit 11 (Tony Calobrisi's April 3, 2014 email to sales representatives).

81.     Senior management at Millennium, including CEO Brock Hardaway, CFO Tim Kennedy, and President Howard Appel were informed that this approach was used to drive sales higher and higher. *See* Exhibit 10; Exhibit 12 (May 1, 2015 email from Tony Calobrisi copying Hardaway, Kennedy, and Appel); Exhibit 13 (September 1, 2014 email from Tony Calobrisi, copying Appel and Hardaway).

{00065725; 1 }

-27-

82.     Millennium has recently expanded its practice of testing all patients at a clinic to testing all patients at long term care facilities, such as nursing homes and skilled nursing facilities.  Millennium targeted these facilities because the patient residents were mainly Medicare beneficiaries and the ease of collecting samples once the medical director allowed them to enter the facility.  Millennium preferred representatives to collect samples from Medicare beneficiaries because in addition to Medicare reimbursing for the tests, the patient would never see a bill from the testing.  Even if a test were rejected, which was rare, Medicare and Medicaid patients were not sent a bill.  Millennium accepted whatever Medicare or Medicaid paid as payment in full.  For these reasons, Millennium began trying to gain access to more long term care facilities from which to collect samples.

83.     For example, on February 19, 2014 Millennium's Western Vice President of Sales Nicole Moberg emailed several regional groups of sales representatives with examples of "dares" that sales representatives had been assigning one another to encourage them to find new clients and get more business.  Moberg's dare to one of the sales representatives was for the representative to set up a meeting with the administrator, owner, or doctor of an assisted living facility to gather more information about how to sign on these types of facilities.  Moberg also dared the representative to meet with a doctor for an assisted living facility.  The representative met with both an assisted living facility doctor and executive director to discuss signing their facilities up for PGT.  In addition, the representative met a nurse at a pharmacy that services assisted living facilities, in order to discuss which other similar facilities would be willing to implement PGT testing.  Exhibit 8.

84.     To solicit tests at long term care facilities, Millennium sales representatives contact the medical director of long-term care facilities and propose testing the patients.  The medical directors are generally not at the long-term care facility full-time and may only visit a particular facility for a few hours per week.  Once a long-term facility had filled out the

{00065725; 1 }

New Client Registration, Millennium sales representatives would enter the facility and collect specimens from patients without the medical director's supervision.  In an April 2015 email Josh Calcanis, Millennium's Genetics Sales Specialist, sent notes to sales representatives on how to target nursing homes to collect test samples, urging them to "become the local grandma whisperer and get your geriatric swab on!"  Because Millennium's strategy was to test as many patients as possible, the email directed sales representatives to check off the residents as samples are collected, so they could go over "the small handful that do not get tested" with the home's Director of Nursing, with the goal to convince the director to allow all patients to be tested.  Exhibit 6.

85.    In Calcanis's email, he included an outline of Dan Degrace's observations about top selling points for long term care facilities.  One of the key points Degrace had offered is that because the medical directors of such facilities are usually present at the facility only for a few hours a week they can't know every patient.  PGT testing, Degrace had noted, would give these overloaded medical directors a guide for their medication decisions. But by having sales representatives instead of medical staff collect the specimens and order the tests, Millennium ignored CMS's requirement that a medical provider assess the patient's individual history and symptoms, and order only those tests that a patient requires for treating an illness or disease.  Although Millennium advertises its services as personalized medicine, it circumvented its obligation to make sure that the testing provided corresponded to an individual patient's needs, instead testing every patient without regard for individual needs.

86.    At present, Millennium is still encouraging sales representatives to target nursing homes and assisted living facilities because of the high numbers of Medicare beneficiaries at these facilities.  At a National Sales Meeting for Millennium in July 2015, a breakout session on marketing to nursing homes was held with Degrace.  Degrace told the sales representatives to use Propublica, a website that identifies CPT codes doctors bill in

{00065725; 1 }

order to target doctors with billing codes related to nursing homes. The idea underlying this directive was that if you could meet with a doctor with a high volume of nursing home codes, he or she may be the medical director of several facilities. In a follow-up text message to representatives after the meeting, Josh Calcanis urged representatives to look up assisted living facilities in their areas via Propublica and to "remember Propublica is Medicare focused." Exhibit 14 (Text message from Josh Calcanis).

87.     In addition to targeting long-term care facilities because of the high number of elderly patients receiving Medicare benefits and the lack of medical supervision at such sites, Millennium pursued substance abuse and pain management clinics for similar reasons. Substance abuse clinics typically had many patients who were using medications that Millennium touted as relevant to their PGT testing, such as the CYP2B6 gene test that corresponded to metabolism of Methadone, a drug used to help anti-addiction therapy. Substance abuse clinics also had many patients who were on Medicaid which meant that Millennium would likely be reimbursed for the testing.

88.     For example, in July 2013, then-Regional Sales Director Nicole Moberg emailed sales representatives with tips on how to target Medicaid facilities. She instructed sales representatives to reach out to some on the team that were "great with Medicaid treatment," noting that "These locations have HUGE potential. Some of the FL reps numbers are jumping up solely from the Medicaid treatment facilities, so go get it!" She then instructed sales representatives on how to locate facilities with Medicaid beneficiaries, directing them to look up states' Medicaid websites for substance abuse facilities and to look at the Substance Abuse and Mental Health Services Administration website, which contains a treatment center map showing the location of each Medicaid substance abuse facility. Exhibit 15 (July 25, 2013 email from Nicole Moberg to sales representatives).

89.    Like nursing homes, substance abuse clinics are typically run by medical directors who are not present full-time at the facilities.  In order to convince medical directors to sign up as new clients and allow sales representatives into the clinic to collect test samples, Millennium representatives would tell directors that Medicare or Medicaid covered the testing and Millennium does not collect unpaid bills for the uninsured or cash pay patients, so there was no reason not to test all patients.  Once Millennium had signed up a facility with the New Client Registration form, it used this as permission to go into clinics and begin collecting samples for as many patients as possible without having providers fill out requisition forms based on the patient's individual symptoms and history.  This enabled Millennium to enter clinics and collect samples without the doctor or other medical staff to ensure that only those tests that were medically necessary for a unique patient were ordered.

90.    Similarly, Millennium focused on pain management clinics that also prescribe many of the drugs Millennium claimed their PGT test would help evaluate.   Pain management clinics were lucrative targets for Millennium because they tended to have a high number of patients per day, and the more samples a sales representative was able to collect the more compensation they would receive and the higher their collection numbers would be.  In addition, pain management clinics were attractive to Millennium for reimbursement purposes because many of their patients tended to receive either Medicare or Medicaid benefits.

91.    In order to increase the number of tests ordered per patient, sales representatives would tell medical staff that in addition to the pain management-related tests, patients should receive the mental-health related tests as well because patients might have depression at some point in the future and their reaction to antidepressants should be checked.  Testing patients' genes to see how they might react to a drug the patient is not considering, for a future condition that the patient does not currently have, directly

contradicts Medicare requirements that lab tests may be reimbursed only for conditions relevant to a patient's distinct conditions—not for speculative purposes that may or may not materialize at some point in the future.

92.     At long-term care facilities, substance abuse clinics, pain management clinics, and other medical providers, sales representatives would choose to run the entire test suite to highlight the benefits of the tests and encourage more testing.   The full test suite encompasses testing for variants of fourteen genes across four medication categories: pain management, cardiovascular health, mental health, and addiction.   Running the panel for all fourteen genes includes tests irrelevant to a particular patient's needs.   Because the tests were generally billed to Medicare, Medicaid, or another government health program, doctors had less incentive to care which tests were being ordered because Millennium was both billing CMS directly and receiving reimbursement.   Millennium's suggested billing price to test all genes was $3,423.04.

93.     For example, testing for the HLA-B*-15:02 gene variation is part of the test panel.   But this test is relevant and medically necessary for only a specific ethnic subset of the population and then only before the patient begins certain anticonvulsant drugs.   Clinical studies have demonstrated that people of Asian ancestry, particularly individuals with Chinese or Southeast Asian ancestry, are far more likely to have the HLA-B*-15:02 allele than other ethnicities.   Having this allele increases the serious risk of developing Stevens-Johnson Syndrome or Toxic Epidermal Necrolysis when taking the anticonvulsant drug Carbamazepine or similar drugs.   Because of this risk, Medicare Part B carriers have recognized that PGT testing for this genotype is medically necessary in Asian individuals who have a medical need for anticonvulsant medication and have not yet begun the medication.   However, Millennium's sales representatives market this test for all patients, regardless of the fact that it is only relevant for a small subset of the population under very

{00065725; 1 }

-32-

specific circumstances.   Having it as part of a test panel ensures that it is ordered more than was medically reasonable and necessary.   Sales representatives were encouraged to promote this test individually as well.   Testing non-Asian individuals, or individuals who have no need for anticonvulsant medication, has no medical value and merely wastes Medicare resources.

94.   Recently, Millennium has instructed sales representatives to stop describing their specimen collecting practices in emails.   Representatives were told via text message in March or April 2015 to be extra careful with emails and to keep emails brief, to the point, and clinically oriented.   Exhibit 16 (Text message from Jake Knee).   While Millennium tried to keep representatives from documenting their practices via email, Millennium did not actually change those practices to comply with Medicare conditions of payment.

95.   Similarly, at a national meeting for Millennium's sales representatives in July 2015, Millennium CEO Brock Hardaway told sales representatives that Millennium will be subject to a corporate integrity agreement ("CIA") arising from fraud allegations regarding drug testing of urine samples.   Jake Knee, regional manager, told his team that as long as they use the phrase "medically necessary" they can cover themselves.   Sales representatives were encouraged to frequently using the phrase when marketing PGT testing to doctors and discussing protocol, even though many of the tests are investigational and can't meet the test of medical necessity in most cases.   Although Millennium has cautioned representatives to be careful with their language, there has been no instruction for sales representatives to stop the overbroad collection practices and violation of Medicare requirements for coverage.

96.   By using sales and collection tactics that ignore Medicare conditions of payment, Millennium has greatly increased its submission of claims for payment for PGT tests.   Brandon Worley, Senior V.P. of Sales informed sales representatives that Millennium does more PGT testing than any lab in the world.

{00065725; 1 }

-33-

**B. Millennium Knowingly Submits Claims for Payment that are False or Fraudulent in That the Tests are Investigational and Not Eligible for Payment as Medically Reasonable and Necessary**

97.     Most uses of the PGT tests for which Millennium submits claims are considered investigational and not medically necessary.   Medicare does not cover most of these tests regardless of whether a medical professional ordered them for a particular patient.

98.     The following are examples of tests that Millennium provides and bills the Government for, but which are generally considered investigational and therefore not medically reasonable and necessary or entitled to Medicare coverage.

1.   Testing for Gene CYP2C19

99.     As part of its mental health PGT test offerings, Millennium tests for variations of the CYP2C19 gene that may influence how a patient metabolizes the Serotonin inhibitors (SSRI) antidepressant drugs Citalopram, Escitalopram, and Sertaline.  The CPT code Millennium uses for this test is 81225, and Millennium's suggested billing price is $364.75.

100.     Medicare does not cover CYP2C19 genetic testing for purposes of SSRI usage.  LCDs regarding CYP2C19 gene testing for SSRI metabolism have been issued by Noridian Healthcare Solutions, LLC; CGS Administrators, LLC; First Coast Service Options, Inc.; Palmetto GBA; and Cahaba Government Benefit Administrators.  These LCDs are all identical and have determined that SSRI usage is a non-covered indication for CYP2C19 genetic testing.  Aside from a limited exception not involving SSRI use, "All other testing for CYP2C19 . . . is non-covered until definitive clinical utility is established justify coverage."

101.     Millennium also tests variation in the CYP2C19 gene for tetracyclic antidepressant efficacy.  However, the same LCDs discussed above issued by MACs addressing CYP2C19 testing for SSRI use also address testing for tetracyclic antidepressant absorption.  With regard to tetracyclic antidepressants such as Amitriptyline, the LCD found that "the Clinical Pharmaco-genetics Implementation Consortium did not have enough

evidence to make a strong recommendation for dose modification based on genotype . . . even with genotype information, a suggestion is given to start patients on a low dose, gradually increasing to avoid adverse side effects. Consequently, genotyping is not needed with this approach." As a result, genetic testing is considered investigational for the purpose of tetracyclic antidepressant dosing.

102. Millennium also tests CYP2C19 for the purpose of diazepam absorption. Diazepam is an anti-anxiety drug in the Benzodiazepine class of drugs. Although the LCDs listed above do not specifically address CYP2C19 testing for Benzodiazepine use, the LCDs note that covered CYP2C19 testing is limited to patients taking Plavix, and that "All other testing for CYP2C19 is . . . non-covered until definitive clinical utility is established to justify coverage." Because CYP2C19 testing for Benzodiazepine use would fall into this category of uses not specifically addressed, it too is considered investigational and not covered by Medicare.

## 2. Testing for Gene CYP2B6

103. As part of its pain management PGT test offerings, Millennium tests the gene CYP2B6 for variations that may impact the absorption of nonsteroidal anti-inflammatory drugs ("NSAIDs"), specifically the drug Celecoxib. Celecoxib is a NSAID used to treat pain or inflammation from conditions like arthritis or cramps.

104. Millennium's PGT testing suite also tests the CYP2B6 gene variations for the purpose of determining metabolism of the drug Methadone. Variations in the gene CYP2B6 also may impact the concentration of Methadone in the blood. Methadone is a narcotic pain killer that is also used to help treat heroin, oxycodone, or other opiate addiction. Millennium uses the CPT code 81479 to bill Medicare for this test for both NSAID and Methadone usage purposes. The billing price that Millennium suggests for this test is $237.40.

105.    Although there are no LCDs for the CYP2B6 PGT test, the MAC Palmetto GBA has issued a Medicare Coverage Article regarding CYP2B6 testing and billing. Medicare Coverage Articles are used by Medicare carriers to communicate information about payment, coverage, and coding information that is not published in a LCD, which addresses only whether such service is reasonable or necessary.

106.    Palmetto GBA's Medicare Coverage Article *CYP2B6 Test Coding and Billing Guidelines* states that, "to date a comprehensive review has not established the clinical significance of this enzyme [CYP2B6]. Therefore, CYP2B6 testing does not meet the clinical utility requirements for a Medicare Benefit and is considered a statutorily excluded service." (citing Section 1862(1)(A) of the Social Security Act, which excludes diagnostic testing that is "not reasonable and necessary.")  The Article also states that if a testing panel includes a test for the CYP2B6 gene, the panel will be denied coverage.

### 3.  Testing for Gene CYP2D6

107.    Millennium's PGT suite tests for genetic variations of the gene CYP2D6.  The CYP2D6 genetic test is associated with CPT code is 81226, and Millennium's suggested billing rate for the test is $564.49.  Millennium tests these variations for several reasons.  For pain management purposes, Millennium tests this gene for its association with metabolism of Codeine, Hydrocodone, Oxycodone, and Tramadol.  For mental health purposes, Millennium tests for the metabolism of the SSRI-type antidepressant drugs Fluoxetine, Paroxetine, Venlafaxine, and Vortioxetine.  Millennium also tests for metabolism of the tricyclic-type antidepressant drugs Amitryptline, Clomipramine, Doxepin, Imipramine, Desipramine, and Nortriptyline.  For antipsychotic drugs, Millennium tests CYP2D6 for metabolism impacts with the drugs Arpiprazole, Haloperidol, and Risperidone.  Finally, for Attention Deficit Hyperactivity Disorder ("ADHD"), Millennium's test of CYP2D6 looks at metabolism of the drug Atomoxetine.

108.   MAC CGS Administrators, LLC (Kentucky and Ohio) has issued an LCD that addresses testing of the CYP2D6 gene.  The policy limits CYP2D6 testing associated with CPT code 81226 to patients who are tested prior to beginning treatment with tricyclic antidepressants.  Any testing other than that done prior to tricyclic antidepressant therapy is "non-covered until definitive clinical utility is established to justify coverage" due to insufficient evidence that PGT testing improves clinical outcomes in these situations.

109.   CGS Administrators' LCD specifically addresses PGT testing of CYP2D6 for pain management purposes such as with use of the opioid pain killer drugs Codeine, Hydrocodone, Oxycodone, and Tramadol for which Millennium sells its testing.  The LCD excludes PGT testing from coverage for this purpose because genetic testing for this purpose would avoid adverse events in only 1-2% of the population, and among the population suffering adverse events from the drug, most events are not serious.  This and the fact that codeine is used frequently without PGT testing means that there is "insufficient evidence to support clinical utility of genotyping for management of codeine therapy."

110.   MACs Noridian Healthcare Solutions, LLC; Palmetto GBA; First Coast Service Options, Inc.; and Cahaba Government Benefit Administrators, LLC have also all published LCDs identical to that of CGS Administrators, LLC.  These LCDs deny coverage for PGT testing for the CYP2D6 gene for all purposes other than testing prior to beginning mental health treatment with tricyclic type antidepressants.

4.  Genes CYP2C9 and VKORC1

111.   Millennium tests for variations of the genes CYP2C9 and VKORC1. Alterations in the gene CYP2C9 can create differences in how various individuals metabolize common drugs, including the anticoagulant drug Warfarin.  Similarly, variations in the gene VKORC1 may also impact how much individuals respond to Warfarin.  Millennium offers both of these gene tests as part of the cardiovascular health section of its PGT testing panel.

VKORC1 is billed by Millennium using the CPT code 81355 and with a suggested billing price of $237.40. CYP2C9 is billed using CPT code 81277 with a suggested billing price of $175.08.

112.    On April 5, 2010, a National Coverage Determination for Pharmacogenomic Testing for Warfarin Response was implemented by CMS. This addressed PGT testing for VKORC1 and CYP2C9 for Warfarin dosing. It determined that, aside from randomized, controlled clinical studies, testing was not covered because "the available evidence does not demonstrate that pharmacogenomic testing of CYP2C9 or VKORC1 alleles to predict warfarin responsiveness improves health outcomes in Medicare beneficiaries outside the context of CED, and is therefore not reasonable and necessary under §1862(a)(1)(A) of the Act.

5.   Gene Variation HLA-B*15:02

113.    As part of Millennium's Mental Health PGT offerings, it tests for a specific genetic variation known as HLA-B*15:02. Millennium bills this test using the CPT code 81381, which corresponds specifically to genotyping of this variant. Their suggested billing price is $322.58.

114.    The HLA-B*15:02 variation increases the risk that individuals who are taking certain anticonvulsant drugs such as Carbamazepine, Eslicarbazepine, Fosphenytoin, Lamotrigine, Oxcarbazepine, and Phenytoin will develop a life-threatening rash know as Stevens-Johnson Syndrome or toxic epidermal necrolysis, or a more intermediate condition called SJS/TEN. The HLA-B*15:02 genetic variation has a much higher rate of occurrence, approximately 10-15%, in Chinese, Thai, Malaysian, Indonesian, Filipino, and Taiwanese populations. In contrast, the rate of occurrence in European, African, Native American, and Hispanic populations is dramatically lower—less than 2%.

115.   Although there are no final LCDs that address testing for the HLA-B*15:02 genetic variation, CMS has published a draft LCD that addresses the proposed coverage determination of HLA-B*15:02 genotype testing.  The draft LCD, for MACs CGS Administrators, LLC, Palmetto GBA, and Noridian Healthcare Solutions, LLC proposes a policy that because the incidence of this genetic variation is much higher in Asian populations and the risks posed by Stevens-Johnson Syndrome or toxic epidermal necrolysis are severe, HLA-B*15:02 testing would be covered under certain criteria that would make the test medically necessary.  Under this draft LCD, in order for Medicare to cover the test, the patient must be of Asian ancestry and planning to begin initial treatment with Carbamazepine, Phenytoin, or Fosphenytoin—patients who are already on the drug and tolerating it have no need for testing.  All other uses for the HLA-B*15:02 test would not be medically necessary and as a result not covered by Medicare.

### 6.   Gene MTHFR

116.   Millennium offers testing for variations to the MTHFR gene under its Mental Health offerings.  Millennium's individual test requisition form states that their MTHFR genetic test is associated with supplementation of L-methylfolate.  The gene MTHFR may impact absorption of L-methylfolate, or folic acid, in the body.  While the LCD issued by MACs do not specifically address PGT testing for the purpose of determining L-methylfolate absorption, the LCD determined that "There is broad consensus in the medical literature that MTHFR genotyping has no clinical utility in any clinical scenario.  This testing is considered investigation and is NOT a Medicare benefit."  This LCD was issued by MAC Palmetto GBA for its jurisdictions in North Carolina, South Carolina, Virginia, and West Virginia and is the only LCD available that addresses MTHFR PGT testing.

**C. Millennium Provides Kickbacks to Influence the Use of its Testing Services**

117.    By providing physicians, long term care facilities and other providers with the assistance of sales representatives to perform the time consuming process of collecting specimens for tests, Millennium provides a kickback to the providers in violation of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7(b)(b) ("AKS"). The AKS prohibits, among other things, knowingly and willfully offering or paying "any remuneration" (directly or indirectly, overtly or covertly, in cash or in kind) to induce the referral, recommendation, or purchase of goods or services paid for by federal health care programs. A violation of the AKS is also a violation of the False Claims Act. 42 U.S.C. § 1320a-7b(g).

118.    A Millennium sales representative who has no other responsibilities can collect around 25 specimens a day at a clinic, and even more at a long term care facility. In his email about how to approach nursing homes, Josh Calcanis notes that he can "knock out 40 specimens in a 3 hour window" at a nursing home. *See* Exhibit 6. Even apart from the lack of individualized assessment, a busy healthcare provider could not perform that level of testing without detracting from other work. The provision of essentially free staffing to induce sales of Millennium's tests violates the AKS.

119.    In addition to providing free services to providers to influence the use of Millennium's testing services, Millennium sales representatives provide other kickbacks including food and drink offered for the express purpose of inducing the sale of Millennium's tests.

**D. Millennnium's Conduct Violates its Corporate Integrity Agreement**

120.    Millennium is in the process of settling a case for submitting claims for medically unnecessary urine testing. As part of that settlement, Millennium will be required to enter, or has entered, a corporate integrity agreement to prevent future violations.

Violating a corporate integrity agreement typically subjects the regulated party to automatic penalties in the nature of liquidated damages.

121.    Upon information and belief, the practices described herein violate Millennium's commitments under its new corporate integrity agreement.  To the extent these practices are ongoing and have continued after the execution of the corporate integrity agreement, Millennium is committing additional violations of the False Claims Act by avoiding or concealing an obligation to pay money to the United States,  31 U.S.C. § 3729(a)(1)(G), and states with comparable provisions.

## VI.    CAUSES OF ACTION

### Count I
### Federal False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A), (B), (G)

122.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1-123 above as though fully set forth herein.

123.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.* as amended.

124.    By and through the acts described above, Defendant has knowingly presented or caused to be presented false or fraudulent claims for payment or approval.

125.    By and through the acts described above, Defendant knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

126.    The Government, unaware of the falsity of all such claims made or caused to be made by Defendant, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendant's illegal conduct.

127.    By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

{00065725; 1 }

128.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## Count II
## California False Claims Act
## Cal. Gov't Code §§ 12651(a)(1)–(2), (7)

129.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

130.    This is a claim for treble damages and penalties under the California False Claims Act, Cal. Gov't Code §§ 12651(a)(1)-(2), (7).

131.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

132.    By and through the acts described above, Defendant knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the California State Government.

133.    Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

134.    The California State Government, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

135.    Defendant has damaged, and continues to damage, the State of California in a substantial amount to be determined at trial.

136.    Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

{00065725; 1 }

**Count III**
**State of Colorado Medicaid False Claims Act**
**Colo. Rev. Stat. §§ 25.5-4-305(1)(a)-(b), (f)**

137.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

138.    This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act.

139.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the Colorado State Government for payment or approval.

140.    By and through the acts described above, Defendant knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the Colorado State Government.

141.    Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Colorado State Government to approve and pay such false and fraudulent claims.

142.    The Colorado State Government, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

143.    Defendant has damaged, and continues to damage, the State of Colorado in a substantial amount to be determined at trial.

144.    Additionally, the Colorado State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count IV**
**Connecticut False Claims Act**
**Conn. Gen. Stat. §§ 17b-301b(a)(1)–(2), (8)**

{00065725; 1 }

-43-

145.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

146.    This is a claim for treble damages and penalties under the Connecticut False Claims Act.

147.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the Connecticut State Government for payment or approval.

148.    By and through the acts described above, Defendant knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the Connecticut State Government.

149.    Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Connecticut State Government to approve and pay such false and fraudulent claims.

150.    The Connecticut State Government, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

151.    Defendant has damaged, and continues to damage, the State of Connecticut in a substantial amount to be determined at trial.

152.    Additionally, the Connecticut State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.


## Count V
## Delaware False Claims and Reporting Act
### 6 Del C. §§ 1201(a)(1)–(2), (7)

153.    Relator realleges and incorporates by reference the allegations contained in paragraphs1 through 123 above as though fully set forth herein.

154.    This is a claim for treble damages and penalties under the Delaware False Claims and Reporting Act.

155.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

156.    By and through the acts described above, Defendant knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the Delaware State Government.

157.    Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

158.    The Delaware State Government, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

159.    Defendant has damaged, and continues to damage, the State of Delaware in a substantial amount to be determined at trial.

160.    Additionally, the Delaware State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

### Count VI
### District of Columbia False Claims Act
### D.C. Code §§ 2-381.02(a)(1)-(2), (6)

161.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

162.    This is a claim for treble damages and penalties under the District of Columbia False Claims Act, D.C. Code § 2-381.02(a)(1)-(2), (6).

163.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims for payment or approval.

164.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records and statements, material to false and fraudulent claims.

165.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the District of Columbia.

166.    The District of Columbia Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

167.    By reason of Defendant's acts, the District of Columbia Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

168.    Additionally, the District of Columbia Government is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## Count VII
### Florida False Claims Act
### Fla. Stat. §§ 68.082(2)(a)-(b), and (g)

169.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

170.    This is a claim for treble damages and penalties under the Florida False Claims Act, Fla. Stat. §§ 68.081 through 68.092.

171.   By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims for payment or approval.

172.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records and statements, material to false and fraudulent claims.

173.   By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Florida.

174.   The Florida State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

175.   By reason of Defendant's acts, the Florida State Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

176.   Additionally, the Florida State Government is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## Count VIII
## Georgia State False Medicaid Claims Act
## Ga. Code Ann. §§ 49-4-168.1(1), (2), (7)

177.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

178.   This is a claim for treble damages and penalties under the Georgia State False Medicaid Claims Act.

179.   By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims for payment or approval.

180.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records and statements, material to false and fraudulent claims.

181.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Georgia.

182.    The Georgia State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

183.    By reason of Defendant's acts, the Georgia State Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

184.    Additionally, the Georgia State Government is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

**Count IX**
**Hawaii False Claims Act**
**Haw. Rev. Stat. §§ 661-21(a)(1)–(2), (6)**

185.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

186.    This is a claim for treble damages and penalties under the Hawaii False Claims Act.

187.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

188. By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the Hawaii State Government.

189. Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

190. The Hawaii State Government, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

191. Defendant has damaged, and continues to damage, the State of Hawaii in a substantial amount to be determined at trial.

192. Additionally, the Hawaii State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

### Count X
### Illinois Whistleblower Reward and Protection Act
### 740 Ill. Comp. Stat. §§ 175/3(a)(1)(A)–(B), (G)

193. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

194. This is a claim for treble damages and penalties under the Illinois Whistleblower Reward and Protection Act.

195. Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

196.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the Illinois State Government.

197.    Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

198.    The Illinois State Government, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

199.    Defendant has damaged, and continues to damage, the State of Illinois in a substantial amount to be determined at trial.

200.    Additionally, the Illinois State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## Count XI
## Indiana Medicaid False Claims and Whistleblower Protection Act
## Ind. Code §§ 5-11-5.7-2(a)(1)-(2), (6)(B)

201.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

202.    This is a claim for treble damages and penalties under the Indiana Medicaid False Claims and Whistleblower Protection Act.

203.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims for payment or approval.

204.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records and statements, material to false and fraudulent claims.

{00065725; 1 }

-50-

205.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Indiana.

206.    The Indiana State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

207.    By reason of Defendant's acts, the Indiana State Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

208.    Additionally, the Indiana State Government is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

### Count XII
### Iowa False Claims Act
### Iowa Code §§ 685.2(1)(a)–(b), (g)

209.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

210.    This is a claim for treble damages and penalties under the Iowa False Claims Act.

211.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the Iowa State Government for payment or approval.

212.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the Iowa State Government.

213.    Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Iowa State Government to approve and pay such false and fraudulent claims.

{00065725; 1 }

214.    The Iowa State Government, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

215.    Defendant has damaged, and continues to damage, the State of Iowa in a substantial amount to be determined at trial.

216.    Additionally, the Iowa State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## Count XIII
## Louisiana Medical Assistance Programs Integrity Law
## La. Rev. Stat. §§ 46:438.3(A)–(C)

217.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

218.    This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

219.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

220.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the Louisiana State Government.

221.    Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Louisiana State Government to approve and pay such false and fraudulent claims.

222.    The Louisiana State Government, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

223.    Defendant has damaged, and continues to damage, the State of Louisiana in a substantial amount to be determined at trial.

224.    Additionally, the Louisiana State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## Count XIV
## Maryland False Claims Act
## Md. Code Ann., Health-Gen. §§ 2-602(a)(1)–(2), (8)

225.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

226.    This is a claim for treble damages and penalties under the Maryland False Health Claims Act.

227.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the Maryland State Government for payment or approval.

228.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the Maryland State Government.

229.    Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Maryland State Government to approve and pay such false and fraudulent claims.

{00065725; 1 }

230.   The Maryland State Government, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

231.   Defendant has damaged, and continues to damage, the State of Maryland in a substantial amount to be determined at trial.

232.   Additionally, the Maryland State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## Count XV
## Massachusetts False Claims Law
### Mass. Gen. Laws ch. 12, §§ 5B(a)(1)–(2), (9)

233.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

234.   This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

235.   Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the Massachusetts State Government for payment or approval.

236.   By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the Massachusetts State Government.

237.   Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Massachusetts State Government to approve and pay such false and fraudulent claims.

238.     The Massachusetts State Government, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

239.     Defendant has damaged, and continues to damage, the State of Massachusetts in a substantial amount to be determined at trial.

240.     Additionally, the Massachusetts State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count XVI**
**Michigan Medicaid False Claims Act**
**Mich. Comp. Laws §§ 400.607(2)-(3)**

241.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

242.     This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

243.     Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the Michigan State Government for payment or approval.

244.     By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the Michigan State Government.

245.     Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Michigan State Government to approve and pay such false and fraudulent claims.

246.    The Michigan State Government, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

247.    Defendant has damaged, and continues to damage, the State of Michigan in a substantial amount to be determined at trial.

248.    Additionally, the Michigan State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count XVII**
**Minnesota False Claims Act**
**2014 Minn. Laws §§ 15C.02(a)(1)-(2), (7)**

249.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

250.    This is a claim for treble damages and penalties under the Minnesota False Claims Act.

251.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims for payment or approval.

252.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records and statements, material to false and fraudulent claims.

253.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Minnesota.

254.    The Minnesota State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

{00065725; 1 }

255.    By reason of Defendant's acts, the Minnesota State Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

256.    Additionally, the Minnesota State Government is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

**Count XVIII**
**Montana False Claims Act**
**Mont. Code Ann. §§ 17-8-403(1)(a)–(b), (g)**

257.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

258.    This is a claim for treble damages and penalties under the Montana False Claims Act.

259.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval.

260.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the Montana State Government.

261.    Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Montana State Government to approve and pay such false and fraudulent claims.

262.    The Montana State Government, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

263.    Defendant has damaged, and continues to damage, the State of Montana in a substantial amount to be determined at trial.

{00065725; 1 }

264.     Additionally, the Montana State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count XIX**
**Nevada False Claims Act**
**Nev. Rev. Stat. Ann. §§ 357.040(1)(a)–(b), (g)**

265.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

266.     This is a claim for treble damages and penalties under the Nevada False Claims Act.

267.     Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

268.     By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the Nevada State Government.

269.     Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

270.     The Nevada State Government, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

271.     Defendant has damaged, and continues to damage, the State of Nevada in a substantial amount to be determined at trial.

272.     Additionally, the Nevada State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count XX**
**New Jersey False Claims Act**
**N.J. Stat. §§ 2A:32C-3(a)–(b), (g)**

273.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

274.     This is a claim for treble damages and penalties under the New Jersey False Claims Act.

275.     Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

276.     By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the New Jersey State Government.

277.     Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Jersey State Government to approve and pay such false and fraudulent claims.

278.     The New Jersey State Government, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

279.     Defendant has damaged, and continues to damage, the State of New Jersey in a substantial amount to be determined at trial.

280.     Additionally, the New Jersey State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count XXI**
**New Mexico Medicaid False Claims Act**
**N.M. Stat. Ann. §§ 27-14-4(A), (C), & (E)**

281.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

282.    This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

283.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

284.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the New Mexico State Government.

285.    Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

286.    The New Mexico State Government, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

287.    Defendant has damaged, and continues to damage, the State of New Mexico in a substantial amount to be determined at trial.

288.    Additionally, the New Mexico State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count XXII**
**New York False Claims Act**
**N.Y. State Fin. §§ 189(1)(a)–(b), (g)**

289.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

290.    This is a claim for treble damages and penalties under the New York False Claims Act.

291.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

292.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the New York State Government.

293.    Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New York State Government to approve and pay such false and fraudulent claims.

294.    The New York State Government, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

295.    Defendant has damaged, and continues to damage, the State of New York in a substantial amount to be determined at trial.

296.    Additionally, the New York State Government is entitled to the maximum penalty of $12,000 for each and every violation alleged herein.

## Count XXIII
## Oklahoma Medicaid False Claims Act
## Okla. Stat. tit. 63 §§ 5053.1(B)(1)–(2), (7)

297.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

{00065725; 1 }

-61-

298.    This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

299.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

300.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the Oklahoma State Government.

301.    Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Oklahoma State Government to approve and pay such false and fraudulent claims.

302.    The Oklahoma State Government, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

303.    Defendant has damaged, and continues to damage, the State of Oklahoma in a substantial amount to be determined at trial.

304.    Additionally, the Oklahoma State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count XXIV**
**North Carolina False Claims Act**
**N.C. Gen. Stat. §§ 1-607(a)(1)–(2), (7)**

305.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

306.    This is a claim for treble damages and penalties under the North Carolina False Claims Act.

307.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

308.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the North Carolina State Government.

309.    Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the North Carolina State Government to approve and pay such false and fraudulent claims.

310.    The North Carolina State Government, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

311.    Defendant has damaged, and continues to damage, the State of North Carolina in a substantial amount to be determined at trial.

312.    Additionally, the North Carolina State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## Count XXV
## Rhode Island False Claims Act
## R.I. Gen. Laws §§ 9-1.1-3(a)(1)–(2), (7)

313.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

314.    This is a claim for treble damages and penalties under the Rhode Island False Claims Act.

315.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval.

{00065725; 1 }

316.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the Rhode Island State Government.

317.    Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Rhode Island State Government to approve and pay such false and fraudulent claims.

318.    The Rhode Island State Government, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

319.    Defendant has damaged, and continues to damage, the State of Rhode Island in a substantial amount to be determined at trial.

320.    Additionally, the Rhode Island State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## Count XXVI
### Tennessee False Claims Act and Tennessee Medicaid False Claims Act
### Tenn. Code Ann. §§ 4-18-103(a)(1)–(2), (7) and §§ 71-5-182(a)(1)(A)–(B), (D)

321.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

322.    This is a claim for treble damages and penalties under Tennessee False Claims Act and Tennessee Medicaid False Claims Act.

323.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

324.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the Tennessee State Government.

325.    Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

326.    Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the state presented the false claims. Relator has no control over such entities and no access to records they possess.

327.    The Tennessee State Government, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

328.    Defendant has damaged, and continues to damage, the State of Tennessee in a substantial amount to be determined at trial.

329.    Additionally, the Tennessee State Government is entitled to the maximum penalties pursuant to the Tennessee False Claims Act and the Tennessee Medicaid False Claims Act for each and every violation alleged herein.

## Count XXVII
### Texas Medicaid Fraud Prevention Act
### Tex. Hum. Res. Code Ann. §§ 36.002(1), (2), (4), (7), and (12)

330.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

331.    This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001, *et seq.*

{00065725; 1 }

332.     By and through the acts described above, Defendant has knowingly made or caused to be made false statements or misrepresentations of material facts to permit it to receive payments from the Texas Medicaid program that were not authorized or that were greater than the payments that were authorized.

333.     By and through the acts described above, Defendant have knowingly concealed or failed to disclose information, thus permitting it to receive payments from the Texas Medicaid program that were not authorized or that were greater than the payments that were authorized.

334.     By and through the acts described above, Defendant has knowingly made or caused to be made false statements or misrepresentations of material facts regarding information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program.

335.     By and through the acts described above, Defendant has knowingly made or caused to be made claims under the Medicaid program for services and/or products not approved or acquiesced to by a treating physician.

336.     By and through the acts described above, Defendant has knowingly and improperly avoided an obligation to pay or transmit money to the State of Texas under the Medicaid program.

337.     The State of Texas, unaware of the falsity of all such claims and statements material to payments made, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendant's illegal conduct.

338.     By reason of Defendant's acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

339.    Additionally, the State of Texas is entitled to the maximum penalty of up to $10,000 for each and every violation alleged herein, and up to $15,000 per violation if the violation results in harm to an elderly person.

### Count XXVIII
### Vermont False Claims Act
### Vt. Stat. Ann. Tit. 32, §§ 631(a)(1)-(2), (10) (2015)

340.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

341.    This is a claim for treble damages and penalties under the Vermont False Claims Act.

342.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the Vermont State Government for payment or approval.

343.    Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Vermont State Government to approve and pay such false and fraudulent claims.

344.    The Vermont State Government, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

345.    Defendant has damaged, and continues to damage, the State of Vermont in a substantial amount to be determined at trial.

346.    Additionally, the Vermont State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

### Count XXIX
### Virginia Fraud Against Taxpayers Act

**Va. Code Ann. §§ 8.01-216.3(A)(1)-(2), and (7)**

347.  Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

348.  This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

349.  By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims for payment or approval.

350.  By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the Virginia State Government.

351.  The Virginia State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

352.  By reason of Defendant's acts, the Virginia State Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

353.  Additionally, the Virginia State Government is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

**Count XXX**
**Washington State Medicaid Fraud False Claims Act**
**Wash. Rev. Code §§ 74.66.020(1)(a)–(b), (g)**

354.  Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

355.    This is a claim for treble damages and penalties under the Washington State Medicaid Fraud False Claims Act.

356.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the Washington State Government for payment or approval.

357.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the Washington State Government.

358.    Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Washington State Government to approve and pay such false and fraudulent claims.

359.    The Washington State Government, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

360.    Defendant has damaged, and continues to damage, the State of Washington in a substantial amount to be determined at trial.

361.    Additionally, the Washington State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## VII.    PRAYER

WHEREFORE, plaintiff prays for judgment against Defendant as follows:

1.    That Defendant cease and desist from violating 31 U.S.C. § 3729, *et seq.*;

2.    That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

{00065725; 1 }

3.      That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the Federal False Claims Act;

4.      That Defendant cease and desist from violating the District of Columbia False Claims Act, D.C. Code §§ 2-381.02(a)-(d); California False Claims Act, Cal. Gov't Code §§ 12651(a)(1)–(2); Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-305(1)(a)-(b); Connecticut False Claims Act, Conn. Gen. Stat. §§ 17b-301b(a)(1)-(2); Delaware False Claims and Reporting Act, 6 Del. C. §§ 1201(a)(1)-(2); Florida False Claims Act, Fla. Stat. §§ 68.082(2)(a)-(b), and (g); Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 to 49-4-168.6; Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21(a)(1)-(2); Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. §§ 175/3(a)(1)(A)-(B); Indiana Medicaid False Claims and Whistleblower Protection Act , Ind. Code § 5-11-5.7 *et seq.* (as amended through P.L. 109-2014); Iowa False Claims Act, Iowa Code §§ 685.2(1)(a)-(b); Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. §§ 46:438.3(A)-(B); Maryland False Health Claims Act, Md. Code Ann., Health-Gen. §§ 2-602(a)(1)-(2); Massachusetts False Claims Law, Mass. Gen. Laws ch. 12 §§ 5B(a)(1)-(2); Michigan Medicaid False Claims Act, Mich. Comp. Laws §§ 400.601 *et seq.*; Minnesota False Claims Act, 2014 Minn. Laws §§ 15C.01-15C.16.; Montana False Claims Act, Mont. Code Ann. §§ 17-8-403(1)(a)-(b); Nevada False Claims Act, Nev. Rev. Stat. Ann. §§ 357.040(1)(a)-(b); New Jersey False Claims Act, N.J. Stat. §§ 2A:32C-3(a)–(b); New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-4(A) & (C); New York False Claims Act, N.Y. State Fin. §§ 189(1)(a)–(b); Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63 §§ 5053.1(B)(1)–(2); North Carolina Medicaid False Claims Statute, N.C. Gen. Stat. §§ 1-607(a)(1)–(2); Rhode Island False Claims Act, R.I. Gen. Laws §§ 9-1.1-3(a)(1)-(2); Tennessee False Claims Act and Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 4-18-103(a)(1)–(2) and §§ 71-5-182(a)(1)(A)–(B); Texas Medicaid Fraud Prevention Act,

Tex. Hum. Res. Code Ann. §§ 36.002(1), (2), (4), (7), and (12); Vermont False Claims Act,
Vt. Stat. Ann. Tit. 8, §§ 630 *et seq.* (2015); Virginia Fraud Against Taxpayers Act, Va. Code
Ann. §§ 8.01-216.3(A)(1)-(2), and (7); and Washington State Medicaid Fraud False Claims
Act, Wash. Rev. Code §§ 74.66.020(1)(a)-(b).

      5.     That this Court enter judgment against Defendant for damages and penalties
under the District of Columbia False Claims Act, D.C. Code §§ 2-381.02(a)-(d); California
False Claims Act, Cal. Gov't Code §§ 12651(a)(1)–(2); Colorado Medicaid False Claims
Act, Colo. Rev. Stat. §§ 25.5-4-305(1)(a)-(b); Connecticut False Claims Act, Conn. Gen.
Stat. §§ 17b-301b(a)(1)-(2); Delaware False Claims and Reporting Act, 6 Del. C. §§
1201(a)(1)-(2); Florida False Claims Act, Fla. Stat. §§ 68.082(2)(a)-(b), and (g); Georgia
State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 to 49-4-168.6; Hawaii False
Claims Act, Haw. Rev. Stat. §§ 661-21(a)(1)-(2); Illinois Whistleblower Reward and
Protection Act, 740 Ill. Comp. Stat. §§ 175/3(a)(1)(A)-(B); Indiana Medicaid False Claims
and Whistleblower Protection Act , Ind. Code § 5-11-5.7 *et seq.* (as amended through P.L.
109-2014); Iowa False Claims Act, Iowa Code §§ 685.2(1)(a)-(b); Louisiana Medical
Assistance Programs Integrity Law, La. Rev. Stat. §§ 46:438.3(A)-(B); Maryland False
Health Claims Act, Md. Code Ann., Health-Gen. §§ 2-602(a)(1)-(2); Massachusetts False
Claims Law, Mass. Gen. Laws ch. 12 §§ 5B(a)(1)-(2); Michigan Medicaid False Claims Act,
Mich. Comp. Laws §§ 400.601 *et seq.*; Minnesota False Claims Act, 2014 Minn. Laws §§
15C.01-15C.16.; Montana False Claims Act, Mont. Code Ann. §§ 17-8-403(1)(a)–(b);
Nevada False Claims Act, Nev. Rev. Stat. Ann. §§ 357.040(1)(a)-(b); New Jersey False
Claims Act, N.J. Stat. §§ 2A:32C-3(a)–(b); New Mexico Medicaid False Claims Act, N.M.
Stat. Ann. §§ 27-14-4(A) & (C); New York False Claims Act, N.Y. State Fin. §§ 189(1)(a)–
(b); Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63 §§ 5053.1(B)(1)–(2); North
Carolina Medicaid False Claims Statute, N.C. Gen. Stat. §§ 1-607(a)(1)–(2); Rhode Island

{00065725; 1 }

False Claims Act, R.I. Gen. Laws §§ 9-1.1-3(a)(1)-(2); Tennessee False Claims Act and

Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 4-18-103(a)(1)–(2) and §§ 71-5-

182(a)(1)(A)–(B); Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann.

§§ 36.002(1), (2), (4), (7), and (12); Vermont False Claims Act, Vt. Stat. Ann. Tit. 8, §§ 630

*et seq.* (2015); Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.3(A)(1)-

(2), and (7); and Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code §§

74.66.020(1)(a)-(b).

      6.     That Relator be awarded all costs of this action, including attorneys' fees and

expenses; and

      7.     That the United States and Plaintiff-Relator recover such other and further

relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

      Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands

a trial by jury.

Dated: August 17, 2015          Respectfully submitted,

 

**C. Richard Newsome**
FL Bar No. 827258
**William C. Ourand**
FL Bar No. 092503
NEWSOME MELTON
201 South Orange Avenue, Suite 1500
Orlando, FL 32801
Tel: (407) 648-5977
Fax: (407) 648 5282
newsome@newsomelaw.com
ourand@newsomelaw.com

 

-AND –

**Claire Sylvia**

{00065725; 1 }

-72-

*Pro Hac Vice Application Pending*
**Emily Stabile**
*Pro Hac Vice Application Pending*
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel:  (415) 836-9000
Fax:  (415) 836-9001
csylvia@pcsf.com
estabile@pcsf.com

Attorneys for Qui Tam Plaintiff Scott Laney

{00065725; 1 }